IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Sean Keith Shields, | NO. C 07-00047 JW |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| James E. Tilton, Warden, | |
| Respondent. | |

## I. INTRODUCTION

This matter is now before the Court for consideration of Sean Keith Shields' ("Petitioner") Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254[1] concerning his 2000 conviction in Contra Costa County Superior Court. For the reasons set forth below, the Petition is DENIED as to all claims.

## II. BACKGROUND

**A.  Facts**

The California Court of Appeal summarized the facts of Petitioner's case as follows (Petitioner is referred to as "Appellant"):[2]

> Tony Lawson testified that on January 3, 1998, he was staying off and on in the apartment of Doris Alston and their two children in Richmond. He was robbed early that morning right in front of Alston's apartment. He did not call the police because he believed

---

[1] (Amended Petition for Writ of Habeas Corpus, hereafter, "Petition," Docket Item No. 10.)

[2] (Notice of Lodging and Index of Records, Ex. 5, Opinion of the California Court of Appeal, hereafter, "Appeal," Docket Item No. 13.)

the incident was over after he was robbed. He did not want to come to court to testify. He had taken methamphetamine earlier on the evening of January 2, 1998, had drunk quite a bit of beer, and had smoked marijuana just before the robbery.

At trial, Lawson claimed not to remember much of what had happened during the robbery, but did acknowledge that two men came towards him, each holding a gun, and demanded money. One man was dressed all in black, including a black coat and hat, and was holding a black nine-millimeter handgun. The other man was wearing a ski mask and was holding an AK-47 assault rifle. They stuck the guns in his face. The men went through his pockets, but he told them he had no money. Alston's apartment door opened during the robbery, but closed again quickly. The men took a new black coat that Lawson was wearing and left on foot. Just after they left, Lawson heard one or two gunshots that sounded like they came from the handgun.[3]

Doris Alston testified that, in the early morning of January 3, 1998, she was in her apartment when she heard people yelling outside her front door. She heard Lawson say to leave him alone, that he did not have anything. She then heard someone tell him to shut up and empty out his pockets. She then heard someone getting hit. She heard something bump the door, and went to the door to listen. Someone said to stop whining and shut up, and "Give me your coat." She heard Lawson repeat that he did not have anything.

When Alston heard Lawson say, "Don't shoot me," she opened the door. She saw Lawson kneeling on the ground. A tall man was standing over him with a sawed-off shotgun pointed at this head, and another man was standing over him with a handgun. The tall man was wearing a mask. The other man had a beanie pulled down over his face so only his mouth and chin were uncovered. He was wearing a blue jumpsuit that zipped up the front. She could not see what race the men were, but by their voices she assumed they were Black. When the man with the handgun pointed the weapon at her, Alston shut her apartment door. She heard one of them tell Lawson, "That bitch open the door again, we gonna blast her."

Alston stood inside the apartment, crying and listening. She heard more arguing, and heard someone twice say, "Take off your jacket." She then heard two shots from the smaller gun, and then heard nothing. Alston convinced her brother, who was at her apartment, to open the door. Alston ran outside and saw the back of a blue van turn the corner off her street. Alston then ran next door to her mother's house and told her mother to call the police. At that time, she thought the men had killed or kidnapped Lawson.

The police later took Alston to where the blue van had crashed. An officer took her to see a man who was handcuffed nearby. She told the officer he looked like her next-door neighbor, Shaq. He was not one of the men she had seen outside her apartment with a gun.[4] She did say one of the robbers was tall and slender like the suspect. Later that morning, Alston learned that Lawson was unharmed.

Alston denied telling Detective Hughes that Shaq's sister had threatened her on the morning of January 4. She also denied telling Detective Hughes that she wanted to relocate because she was scared of Shaq's relatives and friends. Alston also testified that the police

---

[3] Due to Lawson's claimed of inability to recall much of what happened during the robbery, the prosecutor was permitted to read various questions and answers from the preliminary hearing transcript and from a videotaped interview of Lawson.

[4] However, at trial, Alston identified Appellant as "Shaq."

2

moved her and her children to a new location without her requesting or knowing about it in advance. She also denied that three people had approached her the night before the preliminary hearing and told her she had better be at the hearing, and had mentioned Shaq's name. She denied saying, in a videotaped interview, that she was sure that Shaq was the one with the automatic gun; that the second man she was asked to identify was the robber with the sawed-off shotgun; and that if it was Shaq in court, she would not identify him because she would be in danger.[5] Alston further denied telling the police that the man with the sawed-off shotgun had a long black leather jacket and black boots.[6]

Contra Costa Community College District Police Officer David Shipman testified that, while on duty in San Pablo at about 3:25 a.m. on the morning of January 3, 1998, he heard a dispatch to be on the lookout for a blue van that was wanted for kidnapping and robbery in Richmond. A short time later, Shipman saw a blue van turning onto El Portal. Shipman, who was in uniform and in a patrol car with police emblems on the doors, began to follow the van while waiting for another police unit to arrive. The officer turned on the amber bar on the car's light bar; the amber could only be seen from the rear of the vehicle. The van turned into a gas station and Shipman did the same. The van stopped at a pump and Shipman stopped about 10 feet behind it. After about five seconds, the van accelerated out of the gas station, and then turned left.

Shipman followed the van at a distance of about 20 to 25 feet. Almost immediately, he "started taking gunshots into [his] patrol car." The gunshots were coming from in front of him. The first round hit the windshield about a foot to Shipman's right. He ducked down to his left and radioed in that he was being shot at. About two seconds later, the second round hit the driver's side exterior mirror of the patrol car, about six inches away from his head. Shipman then heard about five more impacts of gunfire into his car over about five seconds, and then it stopped. At some point, Shipman saw a head poke out of the driver's side window, look back towards him, and then go back into the van.

Shipman kept following the van, and about 20 seconds later saw another police car coming toward him. The police car made a U-turn and got between Shipman's car and the van, and they all continued driving at about 30 to 35 miles per hour. Eventually, while driving in San Pablo, the van missed a curve in the road and crashed into some parked cars. The subjects left the van. Officer Alameda, who was in the other patrol car, and Shipman stopped, got out of their cars, and started looking for the subjects. Shipman saw someone come out of the corner of an apartment complex and start running. Shipman chased him and saw that the subject was a Black male of medium build, and was wearing a long black jacket and black pants; he also had short black hair and was carrying a rope or leash. Shipman lost sight of the man near an apartment complex. Shipman then backtracked toward the van and found a semi-automatic handgun in some bushes.

---

[5] The relevant preliminary hearing testimony and interview questions and answers, in which she had stated these things, were read to the jury. In the videotaped interview, part of the transcript of which was read to the jury, Alston also had said the clothes of one of the robbers (the zippered blue jumpsuit) were the same clothes Shaq was wearing when she was brought to the scene of the car crash to look at suspects.

[6] On cross-examination, Alston testified that the prosecutor had lied to her or told her to lie in various ways, and that the prosecutor had said she would help Alston, whose children had been taken from her by Child Protective Services, to get her children back.

3

San Pablo Police Officer Eugene Alameda, who had been chasing the van, testified that after the van crashed, he saw that the driver's side door was open and he saw a silhouette running from the driver's side of the van. As Alameda went toward the van, he saw a second person, wearing dark clothing, come out from the passenger side of the van and start to run. Alameda started to chase that person. When an officer in a patrol car pulled in front of the man, he turned around and ran back at Alameda. At that point, Alameda ordered the man to the ground at gunpoint. The man did not comply and struggled with another officer who came from behind him. Alameda sprayed pepper spray in the man's face, which allowed the officers to subdue the man enough to handcuff him. The man, who was wearing a jumpsuit, claimed to have been the victim of a kidnaping. At trial, Alameda identified the man as Appellant.

Brumel Yansane testified that on January 3, 1998, at about 3:50 a.m., he was parking his car in the parking lot by his apartment on Rivers Street in San Pablo when a Black male wearing a black or brown raincoat approached him. The man told Yansane not to talk and to act like he was not there, before hiding behind Yansane's car. A police officer came up and asked if Yansane had seen somebody, and Yansane said he had not. The man then followed Yansane, his wife, and infant son to their apartment. Yansane saw many police cars around, and told the man he could not come inside the apartment. But he told the man he could go to the fitness room, which was on the same floor. Yansane then closed his door. The man started knocking very hard on the door, so Yansane called the police.

About 25 minutes later, Yansane went outside to smoke and found a belt on the ground outside his apartment, which he gave to one of the many officers in the area. As he returned to his apartment, Yansane saw the same man go into the fitness room. In an audio recording of Yansane's 911 call, which was played for the jury, Yansane said the man wore a black jacket and black pants, He also said the man had one gold tooth in the front. It was stipulated at trial that codefendant Payton had one gold tooth.

Richmond Police Officer Shawn Pickett testified that he was searching at the Rivers Street apartment complex with his police dog early on the morning of January 3, 1998, when he saw that the door to a weight room was open. He saw a black leather jacket under some debris on the floor and ordered the man under the debris to come out. The man came out and was taken into custody. At trial, Pickett identified the man as codefendant Payton.

Richmond Police Officer Laurance Robinson testified that at around 3:45 a.m., he took Doris Alston to view Appellant near the crashed van. Alston identified the van as the one she had seen earlier. When she saw Appellant, she started crying, and said, "That's the one that had the .9 millimeter. That's him." Officer Robinson then took Alston to view codefendant Payton. After hesitating for a minute, Alston said, "That's the one that had the sawed-off shotgun pointed at Tony's head." She also said she was scared becasue they had seen her face and knew where she lived. When asked how she was able to identify Payton, she said that she was able to do so by his height and weight, and the color and fit (dark and baggy) of the clothes he was wearing.

When taken into custody, Payton was 5 feet 10 inches tall and weighed 175 pounds. He was wearing a large leather jacket with belt loops but no belt, black jeans, a black T-shirt, and black boots. Appellant was 5 foot 6 inches tall and weighted 175 pounds. His clothing included a blue coverall.

In the van, police found an assault weapon partially underneath the front passenger seat and a black puffy jacket with a white lining. Tony Lawson identified the jacket as the one taken from him during the robbery. The van had several bullet holes in the rear

4

> passenger door, all of which were exit holes. Just behind the driver's door on the metal panel was another bullet hole, which seemed to be an entry hole.

(Appeal 3-9.)

On April 10, 2000, a jury found Petitioner guilty of attempted second degree murder of a peace officer pursuant to Penal Code § 187/664(e); guilty of robbery pursuant to Penal Code § 211; and guilty of possession of an assault weapon pursuant to Penal Code §12280(b).[7] Petitioner was also found to have personally used and discharged a firearm with regard to the attempted murder and robbery charges, pursuant to Penal Code §§ 12022.5(a) and 12055.53(b) & (c). (Petition at 2.) Petitioner was sentenced to 25 years to life in prison for the attempted murder count, and a consecutive term of 10 years for the § 12022.53(b) sentencing enhancement; 3 years for the robbery charge to run concurrent with the attempted murder count, plus 10 years for the § 12022.53(b) enhancement; and 2 years to run concurrent to the base term for possession of the assault weapon, which was stayed. (Petition at 2.) Petitioner timely filed an appeal. (Petition at 3.)

## B. Case History

On July 13, 2005, the California Court of Appeal reversed the conviction with regard to the possession of an assault weapon pursuant to Penal Code § 12280(b), and reversed and remanded for re-trial the peace officer penalty allegation, pursuant to Penal Code § 667(e). (Answer at 1.) On August 11, 2005, the Court of Appeal granted Petitioner's petition for rehearing on the ground that re-trial of the peace officer penalty allegation would violate the Double Jeopardy clause. (Petition at 3.) On September 13, 2005, the Court of Appeal issued an amended opinion rejecting Petitioner's claim that re-trial of the peace officer penalty provision would violate double jeopardy. (Id.)

On October 24, 2005, Petitioner filed a petition for review in the California Supreme Court. (Petition at 4.) The California Supreme Court denied the petition for review on January 4, 2006. (Id.) One year later, on January 4, 2007, Petitioner filed a Petition for Writ of Habeas Corpus with this Court. (Answer at 1.)

---

[7] (Answer to Petition for Writ of Habeas Corpus at 1, hereafter, "Answer," Docket Item No. 12.)

5

Petitioner initially raised two claims: (1) that the failure to sever Petitioner's trial from his co-defendant's based on mutually exclusive defenses violated his federal constitutional rights to confrontation, a fair trial, and due process; and (2) re-trial of the peace officer penalty allegation was barred by double jeopardy principles. (Answer at 1.) That same day, Petitioner filed a motion to stay the Petition pending the outcome of the re-trial on the peace officer allegation. (Id.)

On July 13, 2007, the trial court dismissed the peace officer penalty allegation and re-sentenced Petitioner to 34 years and eight months in state prison. (Petition at 4.) On September 28, 2007, the Court denied Petitioner's motion for a stay. (Answer at 2.) On November 1, 2007, Petitioner filed a motion for leave to file an amended petition. (Id.) On November 16, 2007, the Court granted Petitioner leave to file an amended petition and ordered Petitioner to file that document within 15 days. (Answer at 2.) However, due to a clerical error, the Amended Petition was not filed until June 30, 2009. (See Docket Item Nos. 8, 9.) In the Amended Petition, Petitioner re-alleges his first claim that his federal constitution rights were violated when the trial court failed to sever his trial from that of his co-defendant. However, Petitioner abandons his second claim, on mootness ground, that the retrial of the police officer penalty provision is barred by the prohibition against double jeopardy.

### III. STANDARDS

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court proceedings unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than deciding the claim on the basis of a procedural rule. Barker v. Fleming, 423 F.3d 1085, 1092 (9th Cir. 2005); Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).

**A.    "Clearly Established Supreme Court Law"**

Clearly established federal law, as determined by the Supreme Court of the United States refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. See Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000); Barker, 423 F.3d at 1093. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. See Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by the Supreme Court." Williams, 529 U.S. at 391 (referring to case-by-case analysis applicable to ineffective assistance of counsel claims); see, e.g., Jackson v. Giurbino, 364 F.3d 1002, 1009 (9th Cir. 2004). There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Lockyer v. Andrade, 538 U.S. 63, 64 (2003). When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. Id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to

7

assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

## B. "Contrary To"

While the "contrary to" and "unreasonable application" clauses have independent meaning, they often overlap. See Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer, 538 at 70-73 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Early v. Packer, 537 U.S. 3, 8 (2002) (*per curiam*). A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

## C. "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13; see also Brown v. Payton, 544 U.S. 133, 141-43 (2005).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; Middleton v. McNeil, 541 U.S. 433, 436 (2004) (*per curiam*); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (*per curiam*) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

8

The objectively unreasonable standard is not a clear error standard. Lockyer, 538 U.S. at 75-76. After Lockyer, "[t]he writ may not issue simply because, in [the federal court's] determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." Clark, 331 F.3d at 1068. Thus, deciding whether the state court decision was unreasonable may require analysis of the state court's method as well as its result. Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

Finally, habeas relief is warranted only if the constitutional error at issue is a structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795-96 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

Where, as in this writ, the California Supreme Court denies review of Petitioner's claim without explanation, the Court looks to the last reasoned state court decision in conducting habeas review. See Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citation omitted) (the district court "looks through" the unexplained California Supreme Court decision to the last reasoned state court decision), cert. denied, 534 U.S. 944 (2001). The California Court of Appeal rendered the last reasoned state court decision in Petitioner's case.

## IV. DISCUSSION

Petitioner makes two claims regarding the trial court's denial of his motion for severance. First, Petitioner contends that his right to a fair trial under the due process clause of the Fifth and Fourteenth Amendments was violated. Second, Petitioner contends that his Sixth Amendment right of confrontation was violated. The Court considers each claim in turn.

### A. Due Process

At issue is whether Petitioner's due process rights under the Fifth and Fourteenth Amendments were violated by the trial court's denial of his motion to severance.

A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process. Grisby v. Blodgett,

130 F.3d 365, 370 (9th Cir. 1997); Herd v. Kincheloe, 800 F.2d 1526, 1529 (9th Cir. 1986). It also may result in the deprivation of the specific constitutional guarantee of the right of confrontation. Id.

A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials. Grisby, 130 F.3d at 370. Nor is it concerned with procedural right to severance afforded in federal trials. Id. Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution. To prevail, therefore, the petitioner must demonstrate "that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair." Id. In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict. Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

Here, Petitioner first contends his and the co-defendant Payton's defenses were mutually exclusive and thus, their trials should have been severed. The Court of Appeal reviewed the defenses as follows:

*Payton's Defense Case*

Forensic toxicologist Warren Cohen testified that he tested a blood sample collected from Payton at 6:55 a.m. on the morning in a question. The sample showed the presence of cocaine metabolite; Cohen opined that Payton ingested cocaine four to six hours before the blood sample was taken. From the sample collected, Cohen also estimated that Payton's blood alcohol level at 3:00 or 3:30 a.m. measure approximately 0.10 percent. At that level of intoxication, a person would likely feel the effects of the alcohol, particularly in performing complex tasks like driving an automobile.

*Petitioner's Defense Case*

On January 2, 1998, Appellant was staying at this mother's house in Richmond. She had cancer and he was helping to care for her. That day, he cleaned up the garage and drank some beer. That evening he walked over to the house of a female friend named Toni, who lived near his mother's house in Richmond. He met Andre Payton there, and drank some more alcohol. He later left the home with Payton. As they stepped outside, they heard gunshots. They crouched down and looked around. Then, two people with guns ran up to them. They ordered Appellant and Payton to get into a van. One person hit Appellant in the head with a gun and Appellant's glasses came off. The two people forced Appellant and Payton to lie face-down on the floor of the van. As he felt the van moving, someone searched Appellant and took his wallet.

Some time later, Appellant heard a banging noise and then a loud explosion that seemed to come from inside the van. Then the van crashed, and Appellant thought he was going to

10

die. He heard people get out of the van and heard someone scream to run. Appellant got out of the van and ran because he was afraid of being shot. As he ran, Appellant saw a police car pull in front of him. He stopped and heard someone scream "freeze" from behind him. He turned around and saw a police officer approaching with his gun pointed at him. Appellant immediately dropped to his hands and knees.

As the officer came up, Appellant tried to tell him he had been kidnapped. The officer said, "Kidnapped, my ass. I'll blow your fucking brains out." Appellant responded, "Fuck this. Fuck you. Do it." The officer then jumped on Appellant's back, maced his face, and handcuffed him.

Appellant repeatedly told the officers that he had been kidnapped. They asked how many people were in the van. Appellant responded that there were four people in the van. He never said that he had been kidnapped by "four big mother-fuckers." He told the officers that he had been kidnapped by "some big mother fuckers."

Appellant denied driving the van, robbing Lawson, and possessing or firing either of the two firearms introduced into evidence. He did admit that he also goes by the name "Shaq."

(Appeal at 8-10.)

With respect to whether the core of co-defendant's Payton's defense was so irreconcilable with the core of Petitioner's own defense that it precluded Petitioner's acquittal, the Court of Appeal found that Payton did not present any evidence during trial that implicated Petitioner. (Appeal at 16.) Rather, it was co-defendant Payton who called forth two witnesses to testify that people not matching the defendants were seen near the crashed van; this testimony in fact supported Petitioner's claim that he was kidnapped. (Appeal at 16.)

Upon review, the Court rejects Petitioner's contention that he was unable to receive a fair trial due to the denial of his motion for severance. "It is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." <u>Zafiro v. United States</u>, 506 U.S. 534, 540 (1993). Petitioner fails to make a particularized showing of prejudice from the denial of severance, instead contending that, in general, when two defendants have antagonistic defenses, the jury will be unable to assess guilt or innocence on an individual and independent basis. The state court reasonably held that the conviction was based not on the conflict between Petitioner's defense and that of his co-defendant, but on the implausibility of Petitioner's defense and the strength of the evidence arrayed against him.

11

Furthermore, any potential prejudice that the conflicting defenses might have caused was effectively ameliorated by the trial court's jury instructions. The jury was instructed to give separate consideration to the evidence presented against each individual defendant, and they were instructed that argument of counsel was not evidence. (Appeal at 17.) "[E]ven if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and juries are presumed to follow their instructions." Zafiro, 506 U.S. at 540. Petitioner was not prejudiced by any error in refusing to sever the trials.

Petitioner relies in United States v. Mayfield for the proposition that "limiting instructions, including a warning that counsel's arguments are not evidence, were insufficient to ensure that the jury ignored the prejudicial evidence introduced by co-defendant's counsel and her forceful closing argument."[8] However, the facts of Mayfield are distinguishable from the record before the Court. In Mayfield, the co-defendant counsel used every opportunity to introduce impermissible evidence against the petitioner. Co-defendant's counsel's closing argument barely even addressed the government's evidence against her client and instead focused on convincing the jury that the petitioner was the guilty party, not her client. (Id.) Based on that record, the Ninth Circuit held that the petitioner and his co-defendant "defense[s] were mutually exclusive because 'the core of the co-defendant's defense is so irreconcilable with the core of [petitioner's] own defense that the acceptance of the co-defendant's theory by the jury precluded acquittal of the defendant.'" Mayfield, 189 F.3d at 900 (quoting United States v. Throckmorton, 87 F.3d 1069, 1072 (9th Cir. 1996)).

Here, in contrast, the record reflects that during closing argument, counsel for co-defendant Payton argued that the prosecution had not proven beyond a reasonable doubt that her client was one of the two people who robbed Lawson or fired a gun, or, if the defendants did fire a gun, there was no evidence of pre-mediation, as compared to a gun fired in panic, as a warning, or by an intoxicated person. Counsel for co-defendant Payton also argued that there was reasonable doubt that there

---

[8] (Petitioner's Reply at 6, hereafter, "Reply," Docket No. 15, citing United States v. Mayfield, 189 F.3d 895, 905 (9th Cir. 1999).)

were only two people in the van and about identification of her client as one of the robbers. (Answer at 9.)

Counsel further argued on behalf of co-defendant Payton:

> I think when you look at those lessers and all the evidence that you've seen in this case, everything that you've heard, it's not what the prosecutor wants you to think. It's the connection that maybe a chauffeur has to his – to his boss, or a fall guy has to the – to the big players, so, you know, sort of a loyal English retainer to hie English lord. And that's the connection.
>
> Ask yourself. Ask yourself when you're thinking about – when you listen to the prosecutor saying, Lump these people together; Andre Payton must have done this: Who is everyone afraid of here? Not Andre Payton.
>
> Who did Doris – who are Doris and Toney reluctant to testify against? Not Andre Payton.
>
> Who did they go to great lengths to protect? Not Andre Payton.
>
> Well, ladies and gentlemen, that's why you might run. The prosecutor had a big point about why flee. Why flee from this scene? There's one reason. Fear.
>
> Look back at the robbery. Is the person that they've identified as Andre Payton in charge? No. That's my – that's why you might run.
>
> Who's likely to be taking orders here? Drive. Hold this. Take this. Run.
>
> That's why you might run. That's why you might run and hide because you have been there. Because you know. Heck, because you're afraid of the police, because you know what might happen when they get you, because you know that they might accuse you even though all you were was there, even though that's all you did and they have nothing more to show you did anything else.
>
> You know that if you're caught in this situation, you are charged and there's nothing you can do about it. That's why you run. That's why you run cause you're afraid because you were merely present at the scene of the crime. At the scene of the crime.
>
> Run. Take this. That does not prove – that does not prove that Andre Payton fired these weapons. Not beyond a reasonable doubt. Not with all the mistakes. Not with all the cracks in this solid house. That does not prove beyond a reasonable doubt that Andre Payton is guilty of any of these crimes, any of the crimes he's been charged with.

(Appeal at 11-12; Answer at 9-10.) Thus, there is no evidence that counsel for co-defendant Payton conceded Payton's involvement in the crime or explicitly accuse Petitioner of having committed the crimes. (Appeal at 16.) Instead, counsel tried to show the weaknesses in the prosecution's evidence against her client and to convince the jury that, even if it found that defendants were involved in the crimes, Payton's participation was minimal compared to that of Petitioner. (Id.)

13

Second, Petitioner contends that he was harmed indirectly by the trial court through the jury instruction requested by co-defendant Payton's counsel, that merely being present at a crime and knowing that a crime is being committed does not make a defendant guilty. (Reply at 7.) Petitioner contends that this instruction benefitted co-defendant Payton alone because it endorsed a defense that co-defendant Payton was less responsible because he was merely present. (Id.) The Court of Appeal found Petitioner's "argument unpersuasive for various reasons, including that, according to [Petitioner's] version of events, he too was present near where the robbery occurred and was in the van when the robbers shot at the police. Thus, the instruction arguably supported his defense." (Appeal at 17 n.13.) The Court finds that the state court's rejection of Petitioner's claim on this basis was not contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, the Court finds that Petitioner is not entitled to habeas corpus relief as to this claim.

**B.     Right of Confrontation**

At issue is whether Petitioner's Sixth Amendment right of confrontation was violated as the result of the trial court's denial of his motion to sever trial from his co-defendant. Relying on Burton v. United States,[9] Petitioner contends that the introduction of Payton's inadmissible and damaging accusations against him through Payton's counsel's arguments deprived Petitioner his right to confront the witnesses and evidence against him. (Petition at 8.)

Use of an out-of-court confession or inculpatory statement of a co-defendant who did not testify at trial violates the non-confessing defendant's right of cross-examination guaranteed by the Confrontation Clause of the Sixth Amendment. This violation is not cured by a jury instruction that the confession should be disregarded in determining the non-confessing defendant's guilt or innocence. Bruton v. United States, 391 U.S. 123, 134-37 (1968).

Here, Petitioner essentially contends that the arguments of his co-defendant's counsel were analogous to Bruton error, because counsel admitted guilt and Petitioner had no opportunity for

---

[9]  391 U.S. 123, 134-37 (1968).

14

cross-examination. (Reply at 5.) The Court finds that this argument is wholly without merit. As a threshold matter, Petitioner has failed to establish that an extrajudicial confession or inculpatory statement was made by co-defendant and entered into evidence against him at trial. See Bruton. Instead, Petitioner contends that the arguments of co-defendant's counsel should be treated as the equivalent of a co-defendant's confession. However, Petitioner fails to offer any authority for such a claim. It has long been held that arguments of counsel are not evidence. See Weeks v. Angelone, 528 U.S. 225, 242 n.3 (2000). The trial court gave a jury instruction reminding the jurors that counsel arguments are not evidence.

In sum, the Court finds that the Court of Appeal's decision was not contrary to, or an unreasonable application of, clearly established federal law, nor did it involve an unreasonable determination of the facts. Accordingly, Petitioner is not entitled to habeas relief on his claims of constitutional error stemming from the trial court's denial of his motion for severance.

## V. CONCLUSION

The Court DENIES the Petition for Writ of Habeas Corpus as to all claims. Judgment shall be entered accordingly.

Dated: January 5, 2010

JAMES WARE
United States District Judge

15

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Michele Joette Swanson michele.swanson@doj.ca.gov
Victoria H. Stafford staffordv@att.net

**Dated: January 5, 2010**                                  **Richard W. Wieking, Clerk**

                                                             **By:    /s/ JW Chambers**
                                                             **Elizabeth Garcia**
                                                             **Courtroom Deputy**